1

\_\_\_\_FILED        \_\_\_\_ENTERED
     \_\_\_\_LODGED    \_\_\_\_RECEIVED

2

OCT 17 2018

3

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                    DEPUTY

4

5

6

7        **UNITED STATES DISTRICT COURT FOR THE**

8        **WESTERN DISTRICT OF WASHINGTON**

9        **AT SEATTLE**

10

UNITED STATES OF AMERICA,            No.  CR18- **251 RSM**

11                Plaintiff,

12            v.                          INFORMATION

13   KYRA EVANS,

14

15                Defendant.

16       The United States Attorney charges that:

17

18                        **INTRODUCTION**

19       At all times material to this Information:

20       1.     AT&T Mobility LLC (hereinafter, AT&T), was a company with

21   headquarters in Atlanta, Georgia, and offices throughout the United States, including a

22   customer service call center in Bothell, Washington.

23       2.     AT&T sold cellular telephones and offered monthly voice and data plans

24   for use with the phones on the AT&T wireless network.  AT&T phones and wireless

25   services were sold through authorized AT&T dealers and retailers across the country.

26       3.     New cellular phones, such as iPhones, cost hundreds of dollars, with many

27   top-end models costing over $500.  To make phones more affordable, AT&T either

28   subsidized the purchase cost of phones or provided an option to purchase phones under

INFORMATION/EVANS (CR18-\_\_\_\_) - 1

1  an interest-free installment plan.  To be eligible for either option, customers needed to
2  agree to enter into long-term service contracts that bound them to AT&T's wireless
3  network.

4      4.     AT&T used proprietary locking software on AT&T phones that prevented
5  the phones from being used on any wireless network other than the AT&T network
6  unless and until the phones were "unlocked."

7      5.     "Unlocking" a phone disabled the proprietary locking software and thereby
8  allowed the phone to be used on multiple carrier systems, rather than exclusively with
9  AT&T.

10     6.     The Wireless Customer Agreement between AT&T and each of its
11 customers provided that AT&T would unlock the customer's phone upon the satisfaction
12 of certain criteria, such as when the customer had satisfied the terms of his or her service
13 contract and/or installment plan.

14     7.     Unlocked phones were a valuable commodity because they could be resold
15 and used on any other compatible network around the world.  If an AT&T customer's
16 phone was unlocked with or without authorization, that customer could switch to another
17 carrier.  If this happened, AT&T would be deprived of the remaining value of the
18 customer's service contract and, if applicable, likely, remaining payments under the
19 customer's installment plan.

20     8.     When phones were unlocked fraudulently without AT&T's authorization
21 and customers switched service to other carriers, the fraudulent transactions deprived
22 AT&T of the stream of payments that were due under the service contracts and
23 installment plans.

24     9.     AT&T employees at the company's call center in Bothell, Washington, had
25 access to AT&T's computer systems to assist AT&T customers with service and billing
26 issues.  Among other things, AT&T employees at the call center had the ability to submit
27 unlock requests on behalf of eligible customers.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

10.     AT&T employees used a variety of internal computer programs at AT&T to process unlock requests.  Access to the systems was limited to authenticated users connected to AT&T's internal and protected corporate network.

11.     AT&T's unlocking systems permitted AT&T employees with proper authorization and network credentials to, in appropriate circumstances, send requests to unlock the phones of AT&T customers.

12.     Malware was malicious computer code running on a computer that was not authorized by the owner/authorized user of that computer.  Malware could be designed to do a variety of things, including logging every keystroke on a computer, stealing information or "user credentials" (passwords or usernames), and executing unauthorized commands without the consent of the authorized user.

## COUNT 1
### (Conspiracy)

13.     The allegations contained in Paragraphs 1 through 12 of this Information are re-alleged and incorporated as if fully set forth herein.

### I.     THE OFFENSE

14.     Beginning at a date unknown, but no later than April 2012, and continuing through in or about September 2017, at Bothell, within the Western District of Washington, and elsewhere, MUHAMMAD FAHD, GHULAM JIWANI, P.V., S.V., M.S., KYRA EVANS, D.W., and others known and unknown, did knowingly and intentionally, agree and conspire:

a.     to devise and execute and attempt to execute a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises; and in executing and attempting to execute this scheme and artifice, to knowingly cause to be transmitted in interstate and

INFORMATION/EVANS (CR18-____) - 3

foreign commerce, by means of wire communication, certain signs, signals and sounds as further described below, in violation of Title 18, United States Code, Section 1343; and

b.   to  knowingly cause the transmission of a program, information, code, and command, and, as a result of such conduct, intentionally cause damage without authorization to a protected computer, and that, during any one-year period, caused loss to one or more persons aggregating at least $5,000 in value or affected 10 or more protected computers, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and (c)(4)(B)(i).

## II.    THE OBJECT OF THE CONSPIRACY

15.    The object of the conspiracy was to gain access to AT&T's protected internal computers by bribing AT&T employees to submit fraudulent and unauthorized unlocking requests through AT&T's internal protected computer network through, among other means, the installation of malware and unauthorized hardware on AT&T's internal network.  The object then was to sell to members of the public the resulting ability fraudulently to unlock cellular phones, permitting members of the public to stop using AT&T wireless services and, thereby, depriving AT&T of the stream of payments it was owed under the customers' service contracts and installment plans.

## III.    THE MANNER AND MEANS OF THE CONSPIRACY

**A.    Overview of the Conspiracy**

16.    Between October 2010 and October 2013, KYRA EVANS was employed as a Customer Support Specialist at AT&T's customer service call center in Bothell, Washington.  As a Customer Support Specialist, one of KYRA EVANS' job responsibilities was to answer telephone calls from customers who had satisfied the criteria to have their cellular telephones unlocked and who wished to do so.  As a Customer Support Specialist, KYRA EVANS had access to AT&T's computer systems and had the ability to submit requests to have cellular telephones unlocked.

INFORMATION/EVANS (CR18-____) - 4

17.     It was part of the conspiracy that, in or about April 2012, MUHAMMAD FAHD contacted M.S., who also was employed as a Customer Support Specialist at AT&T's Bothell, Washington, call center, and offered to pay M.S. to use M.S.'s access to AT&T's computer system to unlock cellular telephones for MUHAMMAD FAHD, and that M.S. agreed to unlock cellular telephones for MUHAMMAD FAHD, without authorization from AT&T and in violation of AT&T's policies.

18.     It was a part of the conspiracy that M.S. subsequently recruited other AT&T Customer Support Specialists, including KYRA EVANS, to perform unauthorized unlocking of cellular telephones for MUHAMMAD FAHD, and that KYRA EVANS agreed to unlock cellular telephones, without authorization from AT&T and in violation of AT&T's policies.  It also was a part of the conspiracy that M.S. and KYRA EVANS then recruited another AT&T employee, D.W., to assist MUHAMMAD FAHD.

19.     It was part of the conspiracy that P.V., S.V., and others known and unknown, who operated businesses that offered unlocking services to the public for a fee, provided lists of international mobile equipment identity (IMEI) numbers for cellular telephones to MUHAMMAD FAHD and GHULAM JIWANI, in order that MUHAMMAD FAHD and GHULAM JIWANI would unlock the cellular telephones, and that MUHAMMAD FAHD and GHULAM JIWANI used AT&T employees, including M.S. and KYRA EVANS, to unlock the cellular telephones.

20.     It was a part of the conspiracy that, from in or about April 2012 to in or about April 2013, MUHAMMAD FAHD and GHULAM JIWANI transmitted instructions to M.S. and KYRA EVANS, via wires in interstate and foreign commerce, including lists of cellular telephone IMEI numbers, for M.S. and KYRA EVANS to submit for fraudulent and unauthorized unlocking.

21.     It was a part of the conspiracy that, from in or about April 2013 to in or about October 2013, MUHAMMAD FAHD asked M.S., KYRA EVANS, D.W, and other AT&T employees, known and unknown, to plant malware on AT&T's internal protected computers for the purpose of gathering confidential and proprietary information about

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 how AT&T's computer network and software applications functioned, and that M.S.,

2 KYRA EVANS, D.W., and others known and unknown, did so.

3     22.    It was a part of the conspiracy that, using information gathered by this

4 malware, MUHAMMAD FAHD, and others known and unknown, created additional

5 malware designed to interact with AT&T's internal protected computers to process

6 fraudulent and unauthorized unlock requests submitted over the wires in interstate

7 commerce from remote servers controlled by MUHAMMAD FAHD, P.V., and others

8 known and unknown.

9     23.    It was a part of the conspiracy that MUHAMMAD FAHD asked M.S.,

10 KYRA EVANS, and others known and unknown, to plant this additional malware on

11 AT&T's internal protected computers, and that M.S., KYRA EVANS, and others known

12 and unknown, did so.

13     24.    It was a part of the conspiracy that the additional malware that M.S.,

14 KYRA EVANS, and others known and unknown, planted on AT&T's computers used

15 network credentials that belonged to actual AT&T employees, including co-conspirators

16 and others, to allow MUHAMMAD FAHD, and others known and unknown, to log into

17 AT&T's internal protected computers under false pretenses to process fraudulent and

18 unauthorized unlock requests.

19     25.    In or about October 2013, AT&T discovered the unlocking malware and

20 identified several AT&T employees, including M.S. and KYRA EVANS, who were

21 operating the unlocking malware.  Shortly thereafter those AT&T employees left, or were

22 terminated by, AT&T.

23     26.    It was a part of the conspiracy that, in or about November 2014,

24 MUHAMMAD FAHD and M.S. asked D.W., to install unauthorized computer hardware

25 devices, including wireless access points designed to provide unauthorized access to

26 AT&T's internal protected computers to facilitate the process of submitting fraudulent

27 and unauthorized unlock requests.

28

INFORMATION/EVANS (CR18-____) - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

27.     It was a part of the conspiracy that MUHAMMAD FAHD supplied devices, including wireless access devices, to M.S. and that M.S. delivered those devices to D.W. for D.W. to install, and thereby to allow MUHAMMAD FAHD, and others known and unknown, unauthorized access to AT&T's internal protected computers.

28.     It was a part of the conspiracy that the unauthorized computer hardware devices, like the previous malware, used network credentials that belonged to actual AT&T employees, including co-conspirators and others, and allowed MUHAMMAD FAHD, and others known and unknown, to log into AT&T's internal protected computers under false pretenses and to process fraudulent and unauthorized unlock requests.

29.     It was a part of the conspiracy that MUHAMMAD FAHD instructed the bribed AT&T employees, including M.S., KYRA EVANS, and others known and unknown, to create shell companies and open business banking accounts in the names of the shell companies, to receive payments from MUHAMMAD FAHD, P.V., and others known and unknown, in order to conceal those payments and to make them appear to be legitimate payments, and that M.S., KYRA EVANS, and others known and unknown, did so.

30.     It was a part of the conspiracy that MUHAMMAD FAHD, P.V., and other conspirators not associated with AT&T, paid a total of more than $1,000,000 in bribes to M.S., KYRA EVANS, and D.W.  Of this amount, more than $280,000 was paid to KYRA EVANS, much of it through an account established in the name Kyra Evans dba Jacinda Consulting.

31.     During the course of the conspiracy, the conspirators caused more than 2,000,000 cellular telephones fraudulently to be unlocked by AT&T through the AT&T employees' submission of fraudulent unlocking requests, and through the conspirators' use of malware and hardware installed on AT&T's systems by the AT&T employees.

32.     Through their conduct, the conspirators caused damage to AT&T's protected computers, including impairment to the integrity and availability of data, programs, systems, and information, and caused losses to AT&T for the costs of

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   responding to the offense, conducting damage assessments, restoring data, programs,

2   systems and information, and lost revenue during any one-year period in excess of

3   $5,000.00.

## IV.   OVERT ACTS

4

5   33.   In furtherance of the conspiracy, and to achieve the objects thereof, the

6   conspirators committed, and cause to be committed, the following overt acts, at Bothell,

7   within the Western District of Washington and elsewhere:

8       a.   On or about September 23, 2013, P.V. made an $8,000 bribe

9   payment to an account controlled by M.S. at JP Morgan Chase.

10       b.   On or about September 23, 2013, P.V. made an $8,000 bribe

11   payment to an account controlled by KYRA EVANS at Wells Fargo.

12       c.   On or about November 25, 2014, MUHAMMAD FAHD sent a

13   router configured to provide unauthorized access to AT&T's internal protected network

14   to M.S. via Federal Express from Dubai, United Arab Emirates, to Lynnwood,

15   Washington.

16       d.   In or about November 2014, M.S. provided a router configured to

17   provide unauthorized access to AT&T's internal protected network to co-conspirator and

18   AT&T employee D.W.

19       e.   In or about November 2014, D.W. installed a router configured to

20   provide unauthorized access to AT&T's internal protected network.

21       f.   On or about November 13, 2014, MUHAMMAD FAHD and

22   GHULAM JIWANI sent a $4,052 payment by Western Union from Pakistan to M.S.

23       g.   On or about August 9, 2015, MUHAMMAD FAHD and GHULAM

24   JIWANI traveled to Dubai, United Arab Emirates, from Karachi, Pakistan, to meet M.S.

25   and deliver an $8,000 payment to him.

26   All in violation of Title 18, United States Code, Section 371.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COUNT 2
### (False Statement)

34.     The allegations contained in Paragraphs 1 through 33 of this Information are re-alleged and incorporated as if fully set forth herein.

35.     For the years 2012 and 2013, KYRA EVANS timely filed United States Individual Tax Returns, Form 1040A and Form 1040A, respectively.  Thus, KYRA EVANS filed a tax return on or before April 15 of the following calendar year.  On each of the tax returns, KYRA EVANS reported the salary that she had received from her regular employers.  KYRA EVANS did not report the bribe payments that she had received from the scheme described in Paragraphs 1 through 33 of this Information on the tax returns that he filed.

36.     The income that KYRA EVANS reported, and the income that she should have reported, for the years 2012 and 2013 was as follows:

| Tax Year | Taxable Income Reported on Return | Additional Income not Reported |
|---|---|---|
| 2012 | $28,634.00 | $72,000.00 |
| 2013 | $12,793.00 | $208,200.00 |

37.     KYRA EVANS' failure to report this income resulted in KYRA EVANS understating her tax obligations for the two years and claiming refunds in both years, when, in fact, KYRA EVANS should have reported, and paid, additional tax due:

| Tax Year | Tax Reported as Due on Return | Correct Tax Due |
|---|---|---|
| 2012 | $3,859.00 | $11,599.00 |
| 2013 | ($1,225.00) | $57,996.00 |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   The total additional tax that KYRA EVANS should have declared and paid for 2012 and

2   2013, based on the undeclared additional income, was $66,961.

3       38.    On or about February 10, 2014, at Shoreline and elsewhere, within the

4   Western District of Washington, KYRA EVANS, a resident of Shoreline, Washington,

5   did willfully make and subscribe a United States Individual Income Tax Return for the

6   calendar year 2013, which was verified by a written declaration that it was made under

7   penalty of perjury. KYRA EVANS did not believe the return, which was filed with the

8   Internal Revenue Service, to be true and correct as to every material matter, in that the

9   return failed to disclose the income that she had received from the fraud scheme

10   described above. KYRA EVANS then and there well knew and believed that she was

11   required by law and regulation to disclose that income.

12       All in violation of Title 26, United States Code, Section 7206(1).

13

14                             **FORFEITURE ALLEGATIONS**

15       39.    The allegations contained in Counts 1 and 2 of this Information are hereby

16   re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant

17   to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code,

18   Section 2461(c), Title 18, United States Code, Section 982(a)(2)(B), Title 18, United

19   States Code, Section 1030(i), and Title 26, United States Code, Section 7301.

20       40.    Pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28,

21   United States Code, Section 2461(c), Title 18, United States Code, Section 982(a)(2)(B),

22   and Title 18, United States Code, Section 1030(i), upon conviction of a conspiracy to

23   violate Title 18, United States Code, Section 1343, and Title 18, United States Code,

24   Sections 1030(a)(5)(A) and (c)(4)(B)(i), in violation of Title 18, United States Code,

25   Section 371, as set forth in Count 1, the defendant shall forfeit to the United States of

26   America, any property, real or personal, which constitutes or is derived from proceeds

27   traceable to the offense. The property to be forfeited includes, but is not limited to, a sum

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of money representing the amount of proceeds the defendant obtained as a result of the

2  offense.

3        41.     If any of the property described above, as a result of any act or omission

4  of the defendant:

5           a.     cannot be located upon the exercise of due diligence;

6           b.     has been transferred or sold to, or deposited with, a third party;

7           c.     has been placed beyond the jurisdiction of the court;

8           d.     has been substantially diminished in value; or

9

10  //

11

12

13  //

14

15  //

16

17

18  //

19

20  //

21

22

23  //

24

25  //

26

27

28

INFORMATION/EVANS (CR18-____) - 11

e.     has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

DATED this \_\_17th\_\_ day of October, 2018.

ANNETTE L. HAYES
United States Attorney

ANDREW C. FRIEDMAN
Assistant United States Attorney

FRANCIS FRANZE-NAKAMURA
Assistant United States Attorney

ANTHONY TEELUCKSINGH    FOR
Trial Attorney
Computer Crime & Intellectual Property
Section, U.S. Department of Justice

INFORMATION/EVANS (CR18-\_\_\_\_) - 12